This is a consolidation of four suits brought under Alabama's Deceptive Trade Practices Act ("the Act"), Ala. Code 1975, §8-19-1 et seq. The trial court directed verdicts for three of the plaintiffs[1] as follows:
Tommy L. Rose against Robin Sheehan and Kitty Quailes jointly and severally for $9,000;
E.B. Vardaman against Robin Sheehan, Kitty Quailes, and Billie Jean Hardy jointly and severally for $9,000; and
Frances Bowden against Robin Sheehan, Kitty Quailes, and Billie Jean Hardy jointly and severally for $13,500.
The court entered judgments on those verdicts. We reverse and remand.
All of the plaintiffs were involved in, and lost money in, an "airplane" scheme known as "People Helping People" ("the scheme").[2] An airplane "flew" based on the inducement of others to pay $1,500 *Page 1212 
each to come aboard as "passengers." An airplane was full when it consisted of eight passengers, four "crew members," two "co-pilots," and one "pilot." Once all of the airplane's "seats" were filled, the pilot received $12,000 and rotated out of the scheme. The only purchase or sale made through this scheme was the right to participate in the chance to receive $12,000, which could be fulfilled only if the appropriate number of people paid their $1,500.[3]
This action was commenced on April 7, 1987; therefore, the applicable standard of review is the "scintilla of evidence" rule. Ala. Code 1975, § 12-21-12. The plaintiffs alleged that the scheme was a "pyramid sales structure" as defined by the Act and that the defendants had violated the Act by inducing the plaintiffs to participate in the scheme. All of the defendants answered, alleging, among other things, that the scheme was a gambling operation and not a "pyramid sales structure."
The trial court found as a matter of law that the scheme did fall within the purview of the Act, and, in fact, was a "pyramid sales structure." We agree. Section 8-19-5 provides, in pertinent part, as follows:
 "The following deceptive acts or practices in the conduct of any trade or commerce are hereby declared to be unlawful:
". . . .
 "(19) Selling or offering to sell, either directly or associated with the sale of goods or services, a right to participation in a pyramid sales structure. As used herein, 'pyramid sales structure' includes any plan or operation for the sale or distribution of goods, services or other property wherein a person for consideration acquires the opportunity to receive a pecuniary benefit, which is based primarily upon the inducement of additional persons, by himself and others, regardless of number, to participate in the same plan or operation, and is not primarily contingent on the volume or quantity of goods, services or other property sold or distributed. . . ."
Section 8-19-3(8) defines "trade or commerce" as follows:
 "Trade or commerce. Includes but is not limited to the advertising, buying, offering for sale, sale or distribution or performance of any service or goods, and any other article, commodity or thing of value wherever situated and shall include any trade or commerce affecting the people of this state."
Furthermore, § 8-19-3(3) defines "goods" as follows: "Goods. Includes but is not limited to any property, tangible or intangible, real, personal, or any combination thereof, and any franchise, license, distributorship, or other similar right, privilege, or interest." The plaintiffs sued under the authority of § 8-19-10:
"§ 8-19-10. Private right of action.
 "(a) Any person who commits one or more of the acts or practices declared unlawful under this chapter and thereby causes monetary damage to a consumer, and any person who commits one or more of the acts or practices declared unlawful in subdivisions (19) and (20) of section 8-19-5 and thereby causes monetary damage to another person, shall be liable to each consumer or other person. . . ."
Section 8-19-3(2) defines "consumer" as: "Any natural person who buys goods or services for personal, family or household use."
It is undisputed that an airplane flew "primarily upon the inducement of additional persons." Also, there can be no question that the commodity offered through the scheme was a "right, privilege, or interest" and thus qualified as "goods" under § 8-19-3(3). With that definition of "goods," it is clear that this enterprise was operated "in the conduct of any trade or commerce." Thus, we hold that the Act affirmatively encompasses the scheme.
The defendants allege further that if the scheme does fall within the purview of the Act, then the plaintiffs failed to comply with the Act because the defendants were not served with "a written demand for *Page 1213 
relief" before the filing of this action. Section 8-19-10(e) provides, in pertinent part:
 "(e) At least 15 days prior to the filing of any action under this section, a written demand for relief, identifying the claimant and reasonably describing the unfair or deceptive act or practice relied upon and the injury suffered, shall be communicated to any prospective respondent by placing in the United States mail or otherwise. . . ."
Subsection (e) also provides exceptions to its demand provision, as follows:
 "The demand requirements of this subsection shall not apply if the prospective respondent does not maintain a place of business or does not keep assets within the state. . . ."
It is undisputed that no demand was served on any defendant at any time. Accordingly, for the directed verdicts to be proper, the plaintiffs had the burden of showing, as a matter of law, that a demand was not required because each defendant fell within one of the two exceptions of subsection (e). Likewise, for the demand requirement and its exceptions to have any rational effect, the time to test whether either of the exceptions to the demand requirement existed must coincide with the 15-day deadline prescribed by the Act. The demand requirement is contained in § 8-19-10 ("Private right ofaction") and not within § 8-19-13 ("Defense"); therefore, the plaintiff has the burden of proving compliance.
For the sake of clarity, we address the demand issue one defendant at a time:
Kitty Quailes:
It is undisputed that at the time of her involvement with the scheme, Ms. Quailes owned real property in the state of Alabama, but that at the time of her trial testimony she did not. In fact, at trial, her undisputed testimony, in pertinent part, was as follows:
 "Q. Mrs. Quailes, did you live in Dallas County in April of 1987?
"A. Yes, sir.
 "Q. Did you have a place of business here where you were cutting hair in 1987?
"A. Yes, sir.
". . . .
 "Q. Did you own any property in Dallas County in 1987?
"A. Yes, sir."
Her testimony, taken in the light most favorable to her, as the nonmovant, points to the existence of a fact question as to whether she owned real property within the state 15 days prior to the filing of these suits against her. Even if we assume that Ms. Quailes did not own real property in the state, that would not be dispositive of whether she "[kept] assets within the State" 15 days prior to the filing of these actions against her. Also, when asked whether she was a partial owner of a business in Alabama known as New Creations, Ms. Quailes responded that she was. But, again, there is no proof that she maintained a place of business in the state 15 days prior to filing this action.
Thus, we hold that there is a fact question as to whether Ms. Quailes "[kept] assets within the State" and whether she "maintain[ed] a place of business" here. Because of that fact question on the demand issue, the verdicts for Rose, Vardaman, and Ms. Bowden against Ms. Quailes were erroneously directed.
Robin Sheehan:
Ms. Sheehan's testimony, in pertinent part, was as follows:
 "Q. . . . Do you maintain a place of business in the State of Alabama?
"A. No, sir.
"Q. Do you own your home?
"A. No, sir."
This, the only testimony about Ms. Sheehan's "place of business" and her "assets," does not conclusively prove that, as a matter of fact, 15 days prior to April 7, 1987, she "[did] not maintain a place of business or [did] not keep assets within the State." Certainly the term, "assets" incorporates more than home ownership. Likewise, whether Ms. Sheehan maintained a place of business within the state at the time of trial is not determinative of the question whether she did so before and up until the deadline prescribed by the Act before which demand must be made. Viewing all the evidence about Ms. Sheehan in a light most favorable to her, as the nonmovant, *Page 1214 
we find that a question of fact exists as to whether Ms. Sheehan should have been served with a demand. Accordingly, the directed verdicts for Rose, Vardaman, and Ms. Bowden against Ms. Sheehan were erroneously directed.
Billie Jean Hardy:
The only evidence about Ms. Hardy's assets or business consisted of her testimony, which follows, in pertinent part:
"Q. Were you employed back in October 1986?
"A. Yes, sir.
"Q. Where were you employed?
"A. Prattville Apparel.
"Q. What did you do for them?
"A. I was — ran a packing machine.
". . . .
"Q. Do you work for Prattville Apparel?
"A. I did.
"Q. But you do not now?
"A. No."
Ms. Hardy's testimony, viewed in the light most favorable to her, as the nonmovant, hardly serves to prove, as a matter of fact, that she "[did] not maintain a place of business or [did] not keep assets within the State" at the time required by the Act for the plaintiffs to serve a demand on Ms. Hardy. Accordingly, the verdicts for Vardaman and Bowden against Ms. Hardy were erroneously directed.
Our thorough review of the record leads us to conclude that a question of fact exists as to whether each defendant fell within one of the two exceptions to the demand provision of the Act.[4] Accordingly, we reverse the judgments of the trial court and remand these cases for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
HORNSBY, C.J., and JONES, SHORES and KENNEDY, JJ., concur.
[1] The trial court also directed verdicts for three defendants, Robin Sheehan, Billie Jean Hardy, and Tina Huffman, against one of the plaintiffs, Lamar Travis; however, that ruling is not before us.
[2] Each participant was known by a code name. The following code names were revealed at trial:
 Tommy Rose: Yard Guard and Moo Cow Robin Sheehan: Poo Mama and Tornado Frances Bowden: C Note Kitty Quailes: May May Billie Jean Hardy: CJ
[3] We note that there are variations on the way each "airplane" technically operates; however, those variations are immaterial to the resolution of this case.
[4] We note the other arguments and issues presented by both parties in their briefs. Because of our resolution of the demand issue, however, we pretermit discussion of those arguments.